IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE,
NATIONAL OFFICE,

       Plaintiff,

v.

VERONICA SOMMERS; ANNETT JAMES;
JUDITH LANDSMAN; GABRIELA
KIOUPAKIS; DARREN O'CONNOR;
MADELYN WOODLEY; JUDY HUSTON;
LOUISA MATTHIAS; GLENDA STRONG
ROBINSON; JOHN HOWELL; VELVETA
GOLIGHTLY-HOWELL; LAWRENCE PEVEC;
SHEILA J. DAVIS,

       Defendants.

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

       Plaintiff, the National Association for the Advancement of Colored People, National Office (the "NAACP" or "National Office"), by and through its undersigned counsel, upon personal knowledge as to itself, its own acts and its allegations as to the contents of documents referred to herein, and upon information and belief as to all other matters, for its Complaint herein alleges as follows:

## INTRODUCTION

       1.     For more than 115 years, the NAACP has fought in furtherance of its mission to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate racial discrimination. It is among the most highly-respected and best-known civil rights organizations in the United States.

       2.     Plaintiff, the NAACP National Office, administers Units throughout the country to effectuate its work at both a nationwide and grassroots level. Each Unit derives its charter authority from the Unit Bylaws and NAACP Constitution and only after approval of the NAACP National Board of Directors. Accordingly, each Unit is subject to those governing documents and to NAACP oversight.

3. For the past several months, Defendants have engaged in a campaign of misinformation and disparagement against the NAACP that has harmed the organization reputationally and, on information and belief, financially. Defendants' unlawful behavior is ongoing and continues to threaten and harm the NAACP and its members.

4. Defendants are former Executive Committee members of the NAACP Boulder County Branch #40AB-B (the "NAACP Boulder Branch" or the "Branch") who overstepped their authority by filing dissolution documents with the Colorado Secretary of State to dissolve the Branch without authority from the National Office. Upon dissolution, Defendants began "winding up" the Branch, including disposing of the Branch's assets and causing irreparable harm.

5. In the course of this wrongful behavior, Defendants have deprived the NAACP of the Branch's existing assets and new donations, converted the Branch's assets, misappropriated trade secrets, publicly disparaged the NAACP, engaged in deceptive trade practices, and conspired against the NAACP.

## PARTIES

6. NAACP is a non-profit corporation incorporated under the laws of the State of Delaware with its principal place of business in Baltimore, Maryland. NAACP is a national 501(c)(4) entity with various Units expressly approved and charted through the NAACP Board of Directors.

7. Defendant Annett James ("James") is a former member of NAACP Boulder Branch who served as President of NAACP Boulder Branch. James is a resident of the State of Colorado.

8. Defendant Judith Landsman ("Landsman") is a former member of NAACP Boulder Branch who served as Vice President of NAACP Boulder Branch. Landsman is a resident of the State of Colorado.

9. Defendant Veronica Sommers ("Sommers") is a former member of NAACP Boulder Branch who served as Treasurer of NAACP Boulder Branch. Sommers is a resident of the State of Colorado.

10. Defendant Gabriela Kioupakis ("Kioupakis") is a former member of NAACP Boulder Branch who served as Secretary of NAACP Boulder Branch. Kioupakis is a resident of the State of Colorado.

11. Defendant Lawrence Pevec ("Pevec") is a former member of NAACP Boulder Branch who served as Assistant Secretary of NAACP Boulder Branch. Strong Woodley is a resident of the State of Colorado.

12. Defendant Darren O'Connor ("O'Connor") is a former member of NAACP Boulder Branch who served as Criminal Justice Chair of NAACP Boulder Branch. O'Connor is a resident of the State of Colorado.

2

13. Defendant Madelyn Strong Woodley ("Strong Woodley") is a former member of NAACP Boulder Branch who served as Freedom Fund Chair of NAACP Boulder Branch. Strong Woodley is a resident of the State of Colorado.

14. Defendant Judy Huston ("Huston") is a former member of NAACP Boulder Branch who served as Religious Affairs Chair of NAACP Boulder Branch. Huston is a resident of the State of Colorado.

15. Defendant Min. Glenda Strong Robinson ("Strong Robinson") is a former member of NAACP Boulder Branch who served as MLK Celebration Chair of NAACP Boulder Branch. Strong Robinson is a resident of the State of Colorado.

16. Defendant Dr. Sheila J. Davis ("Davis") is a former member of NAACP Boulder Branch who served as Environmental & Climate Justice Chair of NAACP Boulder Branch. Daivs is a resident of the State of Colorado. Louisa Matthias ("Matthias") is a former member of NAACP Boulder Branch who served as an At-Large Member of NAACP Boulder Branch. Matthias is a resident of the State of Colorado.

17. John Howell ("Howell") is a former member of NAACP Boulder Branch who served as an At-Large Director of NAACP Boulder Branch. Howell is a resident of the State of Colorado.

18. Defendant Velveta Golightly-Howell ("Golightly-Howell") is a former member of NAACP Boulder Branch who served as an At-Large Director of NAACP Boulder Branch. Golightly-Howell is a resident of the State of Colorado.

19. All Defendants were Directors of the Branch and members of its Executive Committee whose organizational memberships have been suspended and who have been divested of all authority to act on behalf of the Branch or NAACP.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and the parties are citizens of different states.

21. This Court has general and specific personal jurisdiction over Defendants as citizens of this District and because the events giving rise to this Complaint took place in this District.

22. Venue is proper in this District under 28 U.S.C. because the acts giving rise to this Complaint took place in this District.

## BACKGROUND FACTS

23. The NAACP consists of duly organized Units that are chartered by the NAACP Board of Directors.

24. On February 18, 2017, the NAACP Board of Directors approved to charter the NAACP Boulder Branch. Articles of Incorporation for the NAACP Boulder Branch were later filed with the Colorado Secretary of State, attaching the NAACP's letter that the charter was approved, and including in the filing the following provision regarding the distribution of assets on dissolution: "Any assets accumulated during the life of the organization shall be distributed to our State/State-Area governance according to the Bylaws of the NAACP."

### A. Organizational Structure

25. Only the NAACP National Board of Directors may grant authority for a Unit to exist or revoke that authority. Units, in essence, exist only at the pleasure of the NAACP National Board of Directors.

26. Neither the NAACP Constitution nor Unit Bylaws permit a Unit to dissolve itself.

27. While a Unit's Executive Committee is charged with day-to-day decision making and direction of the Unit, all Units are similar to franchises—subject to NAACP oversight, the Unit Bylaws, and the NAACP Constitution, and exist only with the express permission of the National Office.

28. Article III, Section 1 of the NAACP Constitution provides:

> The NAACP shall consist of duly organized State/State-Area Conferences, Branches, Prison Branches, College Chapters, Youth Councils, Junior Youth Councils, High School Chapters, and Authorized Committees of the Association (hereinafter collectively referred to as "Units," as described in the Bylaws for Unites), that are chartered by the Board of Directors of the Association and in good standing according to the policies and procedures determined by the Board of Directors from time to time.

29. Article V of the NAACP Constitution provides, in relevant part:

> The management and governance of the Association shall be vested in a Board of Directors. Without limiting the foregoing, the Board of Directors shall have full power and authority to: … Establish such Units of the Association in such places and under such conditions as it sees fit. Each Unit shall be administered under a charter granted to it by the Board of Directors and in accordance with this Constitution.

4

30. Article XI of the NAACP Constitution provides, in relevant part:

> The Charter of Authority received by a Unit upon its admission to the Association may be suspended or revoked by the Board of Directors of the Association whenever the Board of Directors shall deem it in the best interest of the Association; provided, however, that a full hearing on such changes, consistent with Article X, Sections 7 and 8, be held."

Article XI further provides that, upon the Board of Directors' decision to revoke a Unit's charter, the "Unit shall cease to function and the officers shall forthwith forward all records, property, and monies of the Unit to the National Office . . ."

31. Article III, Section 3 of the NAACP Bylaws for Units provides, in relevant part:

> *Charter Authority*. The Board of Directors shall establish Units, including State/State-Area Conferences, Branches, Prison Branches, College Chapters, Youth Councils, High School Chapters, Junior Youth Councils, Authorized Committees, and such other subsidiaries of the Association in such places and under such conditions as it sees fit. Each of the above shall be administered under a charter granted to it by the Board of Directors and in accordance with the Constitution and Bylaws for Units authorized by said Board of Directors.
>
> > [b]1. *Maintaining a Branch Charter*. A Branch shall maintain no fewer than fifty (50) adult members, shall pay all annual assessments, and shall file all year-end reports as required by the Constitution and Bylaws of the Association in order to maintain its charter.
> >
> > [b]2. A Branch must also maintain good standing with its State/State-Area Conference by filing annual year-end reports and paying all State/State-Area Conference Assessments.

32. Article VIII, Section 2a provides: "The Executive Committee shall have general control of the affairs and programs of the Unit, subject to the authority of the Unit and the provisions of the Constitution and approved Bylaws."

33. Article XI of the NAACP Bylaws for Units governs suspension or revocation of a Unit charter, and mirrors the NAACP Constitution. Like the Constitution, the Unit Bylaws do not provide for a Unit's right to dissolve itself. Rather, Article XI provides, in relevant part:

> The Charter of Authority received by a Unit upon its admission to the Association may be suspended or revoked by the Board of Directors of the Association whenever the Board of Directors shall deem it in the best

5

interest of the Association; provided, however, that a hearing consistent with Article X, Section 7 on such changes be held.

\* \* \*

Upon receipt of the notice by the President or Secretary by mail, publication, or otherwise of charter suspension or revocation, the Unit shall cease to function, and the officers shall forthwith forward all records, property, and monies of the Unit to the Association . . .

**B.   Disagreement Arises Between the National Office and Defendants**

34. Conflict between Defendants and the NAACP National Offices began in or around 2021. Specifically, various members of the Boulder NAACP Branch engaged in conduct which was inimical to the best interests of the NAACP.

35. As a result of the Branch's leadership's continued pattern of refusal to abide by the NAACP Constitution and Bylaws, the NAACP appointed an administrator on or around February 15, 2025 (the "Administrator").

36. The NAACP notified Defendant O'Connor, former Branch Criminal Justice Chair, on February 27, 2025 that his membership was suspended after O'Connor's public remarks that were out of alignment with the NAACP.

**C.   Defendants Attempt to Wrongfully Dissolve the Branch and Distribute its Assets**

37. On March 24, 2025, Defendants James, Landsman, Kioupakis, O'Connor, Strong Woodley, Huston, Matthias, Strong Robinson, Howell, Golightly-Howell, Pevec, and Davis attended a certain Monthly Executive Committee Meeting, the purpose of which was to vote to dissolve the NAACP Boulder County Branch.

38. All twelve Directors and former-Directors present voted unanimously to dissolve the NAACP Boulder Branch and dispose of its assets. Each of these Defendants, with the exception of Defendant Matthias, signed a resolution entitled Plan of Dissolution of NAACP Boulder County Branch #40AB-B adopting and approving dissolution of the Branch in breach of the Unit Bylaws, NAACP Constitution, and their fiduciary duties as officers.

39. Defendant O'Connor was aware that his NAACP membership was revoked and that he was removed from the Executive Committee the month prior to the meeting and his signing the Plan of Dissolution.

40. On March 26, 2025, Defendant Kioupakis filed Articles of Dissolution with the Colorado Secretary of State and news of the dissolution was released publicly. Affixed to the Articles of Dissolution was a "Plan of Dissolution" which specifies that Defendants "adopted the following Plan for winding up and dissolving the Branch including liquidating and distributing its

6

assets." Section 4 of the Plan of Dissolution also specifies that the "Branch shall distribute all of its remaining cash and all of its assets and property to any entity of its choosing."

41. On March 28, 2025, Defendants used the Branch information to communicate to "members, donors, and friends of the NAACP Boulder County Branch" their intent to dissolve the Branch and calling upon "the National NAACP to be held responsible for [its] actions."

42. The March 28, 2025 email was sent without authorization from the National Office, utilizing proprietary information owned by the Branch. Customer lists have long been held as trade secrets. Here, Defendants improperly used a list of names and email addresses of donors, members, and allies of the NAACP Boulder County Branch for the improper purpose of spreading misinformation about the dissolution of the Branch and disparaging the National Office to its members and donors. Defendants misappropriated the Branch's member and donor lists for an improper and unauthorized use.

43. The email also had the effect of halting donations to the Branch and/or NAACP through the Branch website, and stopped new members from joining.

44. Although Defendant Sommers was not present at the March 24 meeting, she affirmed her support of the resolution on April 1, 2025, in an email to the Administrator, contrary to her fiduciary duties as an officer of the Branch.

45. On April 3, 2025, the Administrator attempted to secure all assets and accounts of the Branch, communicating such intention to Defendant Sommers, the former Branch Treasurer. On the same day, Defendant Sommers stated in writing her intent to "finaliz[e] all finances" of the Branch and to make "disbursements … according to the resolution of the [B]ranch's dissolution."

46. Also on April 3, the NAACP notified Defendant Kioupakis, former Branch Secretary, that her membership was suspended and she was removed from the Branch Executive Committee. The NAACP directed Kioupakis to "cease and desist immediately from holding yourself out as a member of the NAACP, a member of Executive Committee of the Boulder County Branch, or as the holder of any office in the Boulder County Branch."

47. The NAACP notified Defendant Sommers on April 4, 2025 that her membership was suspended. In that letter, the NAACP directed Sommers to "**not [] transfer, distribute, or otherwise take or dispose of any cash, assets, or other tangible or intangible property owned by the NAACP Boulder County Branch or to which the NAACP Boulder County Branch as any rights**." (Emphasis in original.)

48. Also on April 4, 2025, the NAACP filed a Statement of Correction Revoking a Filed Document with the Colorado Secretary of State in which Plaintiff specified: "The individual(s) who filed the Articles of Dissolution being revoked had no authority to do so under the NAACP Constitution or NAACP Bylaws for Units."

49. In a second letter to Sommers, dated April 23, 2025 and with the subject line "Preservation of Assets," the NAACP once again reiterated that Sommers' membership had been suspended and that no member of the Executive Committee had the authority to dissolve the NAACP Boulder County Branch, nor to file documents to that effect with the Colorado Secretary of State. Sommers was cautioned that "unauthorized transfer, distribution, taking or disposition of any cash, assets, or other tangible or intangible property" belonging to the Branch or to which the Branch "has any rights would constitute the felony of theft under Colorado criminal law and an intentional tort under Colorado civil law."

50. Despite multiple communications from the National Office directing Defendants that they had no authority to dissolve the Branch, and despite Defendants' fiduciary duties to abide by the Unit Bylaws and NAACP Constitution, on April 25, 2025, Defendant Kioupakis again filed Articles of Dissolution with the Colorado Secretary of State attaching the Plan of Dissolution. At that time, Kioupakis had actual knowledge that her membership was suspended and the National Office had stripped her of her position on the Branch Executive Committee. Yet, knowing she had no authority to do so, Kioupakis filed fraudulent and unauthorized Articles of Dissolution with the Colorado Secretary of State.

51. As of the date of this filing, the Colorado Secretary of State website reflects that the NAACP Boulder Branch has been legally dissolved since April 25, 2025.

52. On or around April 29, 2025, Defendants again misappropriated the Branch's donor and member lists to email donors and members a "save the date" for an upcoming event titled "Help w/ Boulder Branch: A Conversation: Moving Beyond Dissolution to New Beginnings." The email is signed by the "Former Boulder County Executive Committee Members" and classifies the event as an "NAACP related meeting." The event was set for May 5, 2025.

53. The email contains additional disparaging accusations about the NAACP, including a link to an article titled "The National NAACP President Should Be Suspended, Not the San Diego Branch President," and allegations that the NAACP leadership is "disrespectful and devoid of any human decency . . ." Defendants also accuse the NAACP of improper administration of the Branch, including a lack of due process and improper member suspensions.

54. NAACP sent a second cease and desist letter to Kioupakis on April 30, 2025 after learning that she sent "Save the Date" emails using an email address containing "secretary.naacpbouldercounty." In her emails, Kioupakis indicated that she was working with other "Former NAACP Boulder County Executive Committee Members."  Kioupakis knew at the time she sent the emails that she lacked authority to hold herself out as Secretary of the NAACP Boulder County Branch.

55. In its letter, the NAACP repeated that Defendant Kioupakis lacked authority to conduct any further business on behalf of NAACP or the Branch and that any further action is in willful, conscious, and intentional disregard to the prior cease and desist demand from NAACP. The letter further expressly stated that Kioupakis' continued action may constitute tortious

interference, defamation, and to the extent Defendants are using NAACP membership and donor lists, trade secret violations.

56.     On May 2, 2025, Defendants' "Save the Date" was published in the Yellow Sun Magazine and on May 5, 2025, Defendants held the meeting.

D. **Defendants Did Not Have Authority to Dissolve the Branch**

57.     Units only exist with the permission of the NAACP National Board of Directors. While in existence, a Unit has license to use NAACP intellectual property such as member and donor lists, trademarks, logos, goodwill, and other tangible and intangible assets. Accordingly, Units are, in essence, like franchises.

58.     Thus, Units are subject to National Office oversight and NAACP governing documents, and dissolution of a Unit can only come from the NAACP National Board of Directors.

59.     As officers of the Branch, Defendants were aware of the relationship between the Branch and the National Office, and the duties imposed on them as Directors by the NAACP Constitution and the Unit Bylaws long before the events that gave rise to this litigation.

60.     Additionally, NAACP expressly reminded Defendants of their fiduciary duties after the March 24, 2025 meeting, and repeatedly cautioned them that it was not within their power to dissolve the Branch.

61.     Audaciously, Defendants filed articles of dissolution not once but twice after express directives from the National Office to abstain from doing so.

62.     Defendants acted in blatant disregard of National Office directives and their duties as officers. In the process, they caused reputational and, on information and belief, economic harm to NAACP.

E. **Disbursement of Branch Assets**

63.     Upon information and belief, as of the March 24, 2025 meeting, Branch assets included, at least: (i) a checking account ending in 5221 at Vectra Bank Colorado with nearly $77,000 in deposits; and (ii) stock in Google valued at $25,000 as of December 2024.

64.     The NAACP Constitution, Article X, and the NAACP Bylaws for Units, Article XI, require that after the NAACP Board of Directors has revoked a Unit's charter and the Unit is dissolved, the "Unit shall cease to function and the officers shall forthwith forward all records, property, and monies of the Unit to the National Office." Here, no officer or former officer of the Branch has returned the Branch's monies to the National Office.

65. Defendant Sommers, as former Branch Treasurer, is a signatory on the Branch's account(s). Sommers has ignored multiple requests from the Administrator and/or NAACP to turn over the accounts.

66. Defendant Kioupakis has *twice* filed Articles of Dissolution with the Colorado Secretary of State containing a "Plan for winding up and dissolving the Branch including liquidating and distributing its assets." Section 4 of the Plan of Dissolution specifies that the "Branch shall distribute all of its remaining cash and all of its assets and property to any entity of its choosing."

67. On information and belief, Defendants have or intend to soon distribute the Branch's assets. Distribution has harmed, will continue to harm, or will harm the NAACP.

68. Additionally, Defendants have disabled the Branch's website, including its ability to accept new members and donations.

## COUNT I: BREACH OF FIDUCIARY DUTY

69. The NAACP incorporates all preceding paragraphs in this Complaint as if they were expressly set forth herein.

70. Defendants were all members of the Board of Directors of the NAACP Boulder Branch.

71. As Directors, Defendants had a fiduciary responsibility to the NAACP to guard the interests of the Branch.

72. Defendants repeatedly breached their fiduciary duty by: (i) voting to dissolve the Branch, in knowing contravention of the Unit Bylaws and NAACP Constitution; (ii) filing articles of dissolution with the Colorado Secretary of State; (iii) notifying members and donors of this improper dissolution under color of authority they knew they did not have; (iv) removing the Branch website where new members could enroll and where donations were collected; (v) repeatedly disparaging the NAACP; and (vi) on information and belief, disposing of Branch assets.

73. Defendants' unjustifiable actions have resulted in reputational and, on information and belief, monetary damages to Plaintiff.

## COUNT II: CONVERSION

74. The NAACP incorporates all preceding paragraphs in this Complaint as if they were expressly set forth herein.

75. There is no reasonable dispute that the checking account ending in 5221 at Vectra Bank Colorado is and at all times has been the Branch's property. As of March 24, 2025, the account's balance was approximately $77,000.

76. On information and belief, the Branch owns shares in Google, valued at $25,000 as of December 2024.

77. Defendants, and in particular, Defendant Sommers, exercised and continues to exercise dominion and control over the Branch's assets as a signor on the Branch's account(s).

78. Defendants have been repeatedly notified of their removal from the Executive Committee and suspension of their NAACP memberships.

79. Defendants have been repeatedly notified that they do not have authority to act on behalf of the Branch or the NAACP.

80. Defendants, and in particular, Defendant Sommers, have refused and continue to refuse to relinquish control of the Branch's assets, despite repeated requests from the Administrator and the National Office.

81. On information and belief, it is Defendants' intent to dispose of the Branch's assets, and Defendants have begun doing so or intend to begin doing so soon.

82. Defendants unauthorized control over and/or disposal thereof the Branch's assets has deprived the NAACP of those assets.

## COUNT III: CIVIL THEFT

83. The NAACP incorporates all preceding paragraphs in this Complaint as if they were expressly set forth herein.

84. As set forth above, there is no reasonable dispute that the checking account ending in 5221 at Vectra Bank Colorado is and at all times has been the Branch's property. As of March 24, 2025, the account's balance was approximately $77,000.

85. On information and belief, the Branch owns shares in Google, valued at $25,000 as of December 2024.

86. Defendants, and in particular, Defendant Sommers, exercised and continues to exercise control over the Branch's assets as a signor on the Branch's account(s) without authorization. Defendant Sommers has been repeatedly advised of this fact and repeatedly asked to return the assets to the NAACP.

87. Defendants have been repeatedly notified of their removal from the Executive Committee and suspension of their NAACP memberships.

88. Defendants, and in particular, Defendant Sommers, intend to deprive the NAACP permanently of the use or benefit of the Branch's assets, as evidence by Defendants' refusal to relinquish control of the Branch's assets, despite repeated requests from the Administrator and the National Office.

89. On information and belief, it is Defendants' intent to dispose of the Branch's assets, and Defendants have begun doing so or intend to begin doing so soon. Disposal of the assets permanently deprives the NAACP and the Branch of their use and benefit.

## COUNT IV: CIVIL CONSPIRACY

90. The NAACP incorporates all preceding paragraphs in this Complaint as if they were expressly set forth herein.

91. Defendants committed civil conspiracy when all thirteen of them conspired to commit the unlawful acts complained of herein, resulting in reputational and, on information and belief, monetary damages to Plaintiff.

92. Specifically, twelve Defendants attended a certain Monthly Executive Committee Meeting on March 24, 2025 wherein a meeting of the minds was formed and all twelve Directors present voted unanimously to dissolve the NAACP Boulder Branch and dispose of its assets.

93. Each of these Defendants, with the exception of Defendant Matthias, signed a resolution entitled Plan of Dissolution of NAACP Boulder County Branch #40AB-B adopting and approving dissolution of the Branch.

94. Defendant Kioupakis effectuated the conspiracy by filing articles of dissolution on March 26, 2025 and again on April 25, 2025.

95. Defendant Sommers, absent from the March 24 meeting, joined this meeting of the minds and furthered the unlawful conspiracy, as evidenced in her April 1, 2025 email to the Administrator expressing her support of the resolution and subsequent refusal to relinquish Branch accounts and assets even after her membership was suspended and she was removed from the Executive Committee.

96. Defendants further acted on the conspiracy by notifying donors and members of the dissolution on March 28, 2025, sending disparaging and misleading emails on April 29, 2025, and holding a meeting on "NAACP related meeting".

97. Defendants also acted on the conspiracy by disabling the Branch's website and removed its ability to accept new members and donations.

98. The conspiracy resulted in breach of fiduciary duty, conversion, and civil theft.

99. The conspiracy further resulted in reputational and, on information and belief, monetary damages to Plaintiff.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff National Association for the Advancement of Colored People, National Office, prays for the following relief:

A. Injunction against all Defendants for the disposal of any Branch assets; use of Branch assets and trade secrets; and use of NAACP's name, likeness, or marks;

B. Declaratory judgment that the NAACP Boulder Branch has not been lawfully dissolved, and that all Branch assets should rightfully remain with the Branch, as it still lawfully exists;

C. Declaratory judgment that no Defendant has the right to act on behalf of the NAACP or Branch;

D. Equitable relief, including an accounting of Branch assets;

E. Judgment against all Defendants for damages caused by Defendants' actions;

F. Pre-judgement and post-judgement interest;

G. Trial by jury; and

H. All other relief this Court deems proper.

Dated: June 16, 2025　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　By: /s/ Meshach Rhoades
　　　　　　　　　　　　　　　　　　　　　　　　　　Meshach Rhoades
　　　　　　　　　　　　　　　　　　　　　　　　　　Amber R. Gonzales
　　　　　　　　　　　　　　　　　　　　　　　　　　Ashleigh Kaspari
　　　　　　　　　　　　　　　　　　　　　　　　　　CROWELL & MORING LLP
　　　　　　　　　　　　　　　　　　　　　　　　　　1601 Wewatta Street, Suite 815
　　　　　　　　　　　　　　　　　　　　　　　　　　Denver, CO 80202
　　　　　　　　　　　　　　　　　　　　　　　　　　Phone: (303) 524-8617
　　　　　　　　　　　　　　　　　　　　　　　　　　Email: MRhoades@crowell.com
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　AGonzales@crowell.com
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　AKaspari@crowell.com

　　　　　　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*